IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2016 Session

## SHANNON ROBERT GREGORY v. KELLY ANN GREGORY

**Direct Appeal from the Chancery Court for Rutherford County**
**No. 08-0271DR     Mitchell Keith Siskin, Judge**

_____

**No. M2015-01781-COA-R3-CV – Filed June 30, 2016**

_____

This is an appeal of a post-divorce order reinstating Father's alimony obligation and denying Father's petition to terminate child support. Father brought a petition to terminate his alimony and child support obligations after discovering that his ex-wife was living with a third party. Additionally, he argued that his twenty-one year old daughter was not severely disabled and his child support obligation should be terminated. The trial court suspended Father's alimony obligation for the duration of his ex-wife's cohabitation but reinstated the alimony obligation as the cohabitation had ceased by the time of trial. The trial court also determined that the child was severely disabled and ordered child support to continue. Father appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ANDY D. BENNETT, J., joined.

Brad William Hornsby and Heather Graves Parker, Murfreesboro, Tennessee, for the appellant, Shannon Robert Gregory.

Phillip Macklin George, Smyrna, Tennessee, for the appellee, Kelly Ann Gregory.

**OPINION**

### I.     Background & Procedure

Shannon Gregory ("Father") and Kelly Gregory ("Mother") were married for twenty-three years before divorcing in 2009. At the time of the divorce, the parties had one minor child, Stephanie, who has epilepsy. During the pendency of the divorce, Mother received permission from the trial court to relocate to Texas, where Mother's

family could help take care of Stephanie. In addition to the disposition of the parties' marital property, the highly contentious divorce proceedings in this case resulted in Father being ordered to pay Mother $500 per month in alimony *in futuro* and $865 per month in child support for an "indefinite period" due to the court's finding that Stephanie was "severely handicapped."[1] Father filed a petition to alter or amend the final decree of divorce, which resulted in, among other things, Father's child support obligation being lowered to $626 per month in an order entered in December 2010. Additionally, the court's order reflected that the parties agreed that Father's child support obligation would continue until Stephanie turned twenty-two years of age due to her being "disabled" and would be reviewed to determine whether it should continue at that time.

On July 3, 2013, Father filed a petition to terminate alimony and child support. In his petition, Father alleged that there had been a substantial and material change of circumstances in that Mother was employed and living with another individual. Additionally, Father alleged that Stephanie, who was at the time twenty-one years old, no longer lived with Mother but in a group home and received Social Security benefits, thus relieving Mother's need for child support. Mother filed an answer and counter-petition on August 10, 2013, denying that there had been a material change of circumstances or that Stephanie did not live with her. Additionally, Mother alleged that Father had failed to pay the previous two months' alimony despite being ordered to do so. In her counter-petition, Mother also requested that the trial court find Father to be in willful contempt for failure to pay alimony as well as another marital debt as previously ordered. The chancery court entered an order on January 24, 2014, clarifying that the burden was on Mother to show severe disability and that Stephanie remained under her care and supervision. The January 2014 order also referenced the December 2010 order setting child support but misstated that order in noting that "child support would continue after eighteen years of age," rather than until the age of twenty-two. This case was originally set for trial on February 18, 2014, but as a result of the parties filing numerous motions with respect to whether Stephanie should be compelled to testify and whether Father's alimony obligation should be suspended, the matter was continued until January 2015.

The chancery court heard testimony from Father, Mother, and Mother's mother, Linda Key ("Ms. Key"), on January 28, 2015. Additionally, the parties stipulated to the inclusion of written interrogatories completed by Dr. Todd Maraist ("Dr. Maraist"), Stephanie's doctor in Texas. Father lives in Nashville, Tennessee and works for the U.S. Postal Service as well as the Tennessee National Guard. According to Father, he earned $57,607.26 from the Postal Service in 2014 and $84,373.86 in 2010-2014 combined for his National Guard service. Father testified that his child support obligation was current but admitted that he was behind on his alimony obligation, although he did not know the

---

[1]The Final Decree of Divorce was entered on December 9, 2009.

exact amount. He also admitted that he had not been making payments on a Sallie Mae debt he was ordered to pay in the final decree of divorce due to "a lot of issues with work along with my car and my health" as well as the fact that he was in the process of buying a house.

Father stated that he believed his alimony obligation should be terminated because Mother was living with another man in the trailer she rented from Ms. Key. To the best of Father's knowledge, the man was still residing with Mother at the time of trial. Mother admitted to cohabitating with a paramour for about three years from 2012 to 2014 but testified that she had him judicially removed from her home in July 2014. According to Mother, the paramour contributed $250 per month for rent during the first year but was later injured on the job and failed to make financial contributions for the final two years he resided with her. However, Mother stated on cross-examination that sometime after the paramour stopped contributing $250 per month that "[h]e paid some but not much. He would give me $100 for the whole month, and he was supposed to pay [$]250." With respect to her finances, Mother testified that she earns roughly $20,000 per year from her employment in a school cafeteria and Wal-Mart combined. Mother provided the court an itemization of her expenses, although she admitted that $100 of her $200 cell phone expense was attributable to another adult-aged daughter who occasionally paid her portion of that bill. Mother also explained that a $250 "miscellaneous" section included a variety of expenses for Stephanie, including "[m]ovies, going horseback riding, out to eat [and] going to the country club for the Christmas dance."

Father did not dispute that Stephanie meets the definition of disabled under the Americans with Disability Act but asserted that he does not believe "that the Government should mandatory [sic] me to pay child support. They have enough control of my life as it is." Father speaks to Stephanie on the phone "at least four times a week" and has visited with her in Texas. According to Father, Stephanie communicates "very well" and has "math abilities" superior to his own, even though he has a degree in science. Further, Father testified that he believes Stephanie could "easily work" as a cashier and that there was no reason she could not be employed in a hotel cleaning rooms, at a restaurant bussing tables, or in a cafeteria serving food. With respect to daily living capabilities, Father asserted that Stephanie can dress herself, cook for herself, tie her own shoes, fix her bed, and run a vacuum cleaner.

Mother, on the other hand, disputed much of Father's assessment of Stephanie's capabilities. Mother described Stephanie experiencing increasingly frequent severe seizures, slurred speech, and diminished walking capability. According to Mother, Stephanie has become increasingly irritable, leading to violent outbreaks that have, on occasion, resulted in Stephanie being taken to the emergency room. Additionally,

Mother described how Stephanie's personal hygiene had progressively declined. Due to these factors, Mother does not believe Stephanie is capable of working or living on her own. Ms. Key also testified regarding negative changes in Stephanie's behavior and hygiene and noted that Stephanie "is declining." She also expressed a fear of Stephanie choking on her food due to a regression in her ability to care for herself.

Dr. Maraist, a physician specializing in neurology and pain medicine, testified in his deposition that he first began treating Stephanie in February 2009 and has had "about [twelve] clinical visits" with her. Dr. Maraist diagnosed Stephanie with epilepsy and characterized the level of her "mental retardation" as "mild to moderate severity." While not trained as an occupational therapist, Dr. Maraist explained that he has "[twenty-five] years of clinical experience in dealing with epilepsy and mentally challenged individuals." In evaluating Stephanie, Dr. Maraist utilized "muscle strength testing, rapid alternative movements, finger to object movement, sensory testing, [and] balance and gait assessment." He determined that Stephanie's motor skills appeared to be reasonably normal but opined that Stephanie's "mental retardation would prevent her from being able to make informed decisions on matters of finance, life choices, medical decisions and to function in a job that required reasoning and decision making." He further opined that Stephanie is severely disabled and would likely be unable to work at a job now or in the foreseeable future. Further, he stated that he did not believe Stephanie would be able to live on her own or drive an automobile in the next five to ten years. However, Dr. Maraist did admit that he used his "personal professional opinion" to determine whether Stephanie was "severely disabled" and noted that he does not separate "disabled" and "severely disabled."

Both Father and Mother also testified concerning Stephanie's living situation at the time of trial. Mother pays $584 per month for Stephanie to live four days per week, including overnights, in a group home with other individuals who have similar disabilities. According to Mother, spending time in the group home allows Stephanie "to feel of value other than being with [Mother]" and provides her an opportunity to spend time with her peers. Father disputed Mother's assertion that Stephanie lives in the home only four days per week and noted that Stephanie is at the group home every time he calls her, even when he calls on different days every week.

On March 23, 2015, the chancery court issued an order making findings of fact and conclusions of law in this matter. The court specifically found that "Stephanie's condition of mental retardation and epilepsy is in decline." The court also found that Mother's and Ms. Key's testimony regarding Stephanie's health, behavior, and personal hygiene was consistent with the deposition of Dr. Maraist. Based on "uncontroverted proof," the court found that Stephanie is "severely disabled pursuant to T.C.A. § 36-5-101(k)(2)." With respect to the second prong of that statute, the court found that

4

Stephanie is living under the care and supervision of Mother, as evidenced by "the uncontroverted proof" and "further substantiated by [a] Texas guardianship order." The court concluded that the fact that Stephanie stays in the group home several days per week "does not constitute a problem." Finally, the court found that Father is financially able to continue to pay his child support obligation and ordered that support to continue until "such a time as Stephanie is able to live independently. . . ."

With respect to Father's alimony obligation, the court found that Mother had allowed her paramour to live in the home with her, which raised a rebuttable presumption that Mother no longer needed the alimony. The court determined that Mother partially rebutted the presumption during the first year of cohabitation and retroactively reduced Father's obligation to $250 per month for that year. However, the trial court also determined that Mother failed to rebut the presumption of the statute for the last two years of cohabitation and retroactively suspended Father's obligation in full for that period of time. The court then found there were no other substantial or material changes of circumstances proved by either party as required to modify or terminate Father's alimony obligation and ordered Father to continue paying $500 per month *in futuro* effective March 1, 2015. Lastly, the court awarded Mother half her attorney's fees in the amount of $4,080.

Father filed a motion to alter or amend on April 22, 2015, alleging that Mother never submitted an appropriate affidavit for attorney's fees and that the court should have terminated Father's alimony obligation rather than suspend it for the period of Mother's cohabitation. On July 8, 2015, the chancery court issued an order correcting the amount of attorney's fees awarded to Mother to $3,840, finding that its prior ruling suspending Father's alimony obligation was correct, and also finding that Mother was entitled to an additional $2,100 for her attorney's fees in defending the motion. Father appealed.

## II.    Issues

Father presents the following issues for review on appeal:

I.      Whether the trial court abused its discretion in reinstating alimony.

II.     Whether the trial court erred in finding the child severely disabled and continuing Father's child support obligation.

III.    Whether the trial court erred in awarding attorneys' fees to Mother.

Mother also presents one additional issue, which we have reworded slightly:

5

I.      Whether the trial court erred in granting Father an abatement of his alimony obligation.

### III.    Standard of Review

In nonjury cases, this Court's review is *de novo* upon the record of the proceedings in the trial court, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are afforded no such presumption. *Campbell v. Florida Steel,* 919 S.W.2d 26, 35 (Tenn. 1996). "Because modification of a spousal support award is factually driven and calls for a careful balancing of numerous factors, a trial court's decision to modify support payments is given wide latitude within its range of discretion." *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) (internal citations and quotations omitted). On appeal, we are "generally disinclined to second-guess a trial judge's spousal support decision." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). "'[T]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable.'" *Id.* (quoting *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006)). We will find an abuse of discretion "when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* (citing *Wright ex rel. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

### IV.    Analysis

### A.    Alimony

Father's first assignment of error concerns the chancery court's decision to reinstate his alimony obligation, rather than terminating it due to Mother's cohabitation. The statutory language contained in Tennessee Code Annotated section 36-5-121(f)(2)(B) is clear that the remedy for the obligor is a suspension of alimony rather than termination:

> In all cases where a person is receiving alimony *in futuro* and the alimony recipient lives with a third person, a rebuttable presumption is raised that:
> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should **suspend** all or part of the alimony obligation of the former spouse; or

(ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should **suspend** all or part of the alimony obligation of the former spouse.

Tenn. Code Ann. § 36-5-121(f)(2)(B)(emphasis added). By way of contrast, subsection (f)(3) contemplates automatic termination of an alimony obligation when the recipient dies or remarries. Tenn. Code Ann. § 36-5-121(f)(3). Further, we addressed this exact issue in a recent case, *Wiser v. Wiser*, No. M2013-02510-COA-R3-CV, 2015 WL 1955367 (Tenn. Ct. App. Apr. 30, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015). In *Wiser*, we held that, under the cohabitation statute, the court's remedy is to "suspend all or part of the alimony obligation, not terminate the alimony. The clear implication is that if the situation justifying the suspension ceases to exist, the alimony recipient may seek reinstatement of support from the former spouse." *Id.* at *6 (quoting *Woodall v. Woodall*, No. M2003-02046-COA-R3-CV, 2004 WL 2345814 at *5 (Tenn. Ct. App. Oct. 15, 2004) (emphasis in original; internal quotation marks and citation omitted). Additionally, we noted that there was "no authority for, and no purpose to be served by, requiring a ruling based on past cohabitation and the filing and hearing of a subsequent request for reinstatement when cohabitation ceases before the trial on the original modification petition." *Id.* (quoting *Woodall*, 2004 WL 2345814 at *5).

Although Father concedes that suspension, rather than termination, was proper, he also argues that the chancery court applied an incorrect legal standard in reinstating the alimony. In its order, the court found "no other substantial and material changes of circumstances proved by either party as required to modify or terminate alimony *in futuro*" and reinstated Father's original $500 per month alimony obligation. Father cites *Azbill v. Azbill*, 661 S.W.2d 682 (Tenn. Ct. App. 1983), in which this Court analyzed a predecessor of our current cohabitation statute, for the proposition that the burden with regard to the reinstatement of alimony was on Mother to show that she was still in need of $500 per month. In that case, this Court determined that "[o]nce [a finding of cohabitation] is made, it is incumbent upon the alimony recipient to then show by the greater weight or preponderance of the evidence that he or she needs the amount of support previously awarded." *Azbill*, 661 S.W.2d at 687. However, the burden contemplated in *Azbill* applies only to the recipient's need to overcome the statutory presumption that alimony is no longer needed while cohabiting. Once cohabitation ceases and alimony is reinstated, the burden shifts back to the obligor to prove that a modification is necessary. Here, the chancery court determined that no substantial or material change of circumstances was proved by either party. Accordingly, we conclude that the chancery court did not abuse its discretion or apply an incorrect legal standard in its decision to reinstate Father's original alimony obligation.

7

While Mother contends that the court was correct to reinstate her alimony award, she argues that the court erred in granting Father an abatement of his alimony obligation for two of the three years in which she cohabitated with her paramour. We disagree. Although Mother testified that her live-in paramour did not financially contribute for two years and was, in fact, a burden, the chancery court nevertheless found that Mother did not overcome the statutory presumptions of Tennessee Code Annotated sections 36-5-121(f)(2)(B)(i) & (ii). Despite the fact that the chancery court's order does not explicitly spell it out, it is readily apparent from the record that Mother failed to overcome the presumption in subsection (f)(2)(B)(ii) of the cohabitation statute, namely that "[t]he third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded . . . ." Tenn. Code Ann. § 36-5-121(f)(2)(B)(ii). Our review of the record reveals that Mother admitted to financially supporting a third party during those two years and that she did not offer sufficient proof to overcome the statutory presumption for suspension of alimony. Accordingly, we conclude that the chancery court did not err in suspending Father's alimony obligation in full for two of the three years in which Mother lived with her paramour.

### B.    Child Support

Father's second assignment of error concerns the chancery court's determination that Stephanie is severely disabled and living under Mother's supervision and care. Tennessee Code Annotated section 36-5-101(k)(1) provides that

> Except as provided in subdivision (k)(2), the court may continue child support beyond a child's minority for the benefit of a child who is handicapped or disabled, as defined by the Americans with Disabilities Act, compiled in 42 U.S.C. § 12101 et seq., until such child reaches twenty-one (21) years of age.

Subdivision (k)(2) further provides that

> [S]uch age limitation shall not apply if such child is **severely disabled** and living under the care and supervision of a parent, and the court determines that it is in the child's best interest to remain under such care and supervision and that the obligor is financially able to continue to pay child support.

Tenn. Code Ann. § 36-5-101(k)(2) (emphasis added). Here, Father disputes the chancery court's findings that Stephanie is severely disabled and that she is living under the care and supervision of her mother.

There is no statutory definition of "severely disabled." However, this court has

8

addressed this issue both in *Cook v. Hess*, No. M2012-01554-COA-R3-CV, 2013 WL 1788553 (Tenn. Ct. App. Apr. 24, 2013), and *Finn v. Bundy*, No. N2003-01368-COA-R3-CV, 2005 WL 418793 (Tenn. Ct. App. Feb. 22, 2005). "[T]he determination of whether a particular person is 'severely disabled' requires an individualized assessment of how that person's physical and mental impairments affect his or her ability to live independently." *Cook*, 2013 WL 1788553 at *7. In both cases, we determined that the children in question were "severely disabled" after conducting a *de novo* review of the trial court proceedings.

In *Finn*, the child in question "had serious medical problems" and was "also mentally retarded and ha[d] impaired speech and fine motor" skills with a mental age between five and eight years old. *Finn*, 2005 WL 418793 at *1-2. The child's physician submitted a report stating that the child was "unable to live without adult supervision and assistance." *Id.* Additionally, both his mother and sister testified that the child required a great deal of supervision and that he was incapable of being left alone for more than a couple of hours and could not take care of his physical needs, his affairs, or his personal hygiene. *Id.*

Similarly, the child in *Cook* suffered from spina bifida his entire life, resulting in physical and mental problems. *Cook*, 2013 WL 1788553 at *4. Although the child obtained a driver's license, he was involved in a hit and run accident several months after obtaining his license, and his mother decided to discontinue his driving privileges. *Id.* Despite his limitations, the child greeted and assisted customers in a hardware store where he earned nearly ten dollars per hour. *Id.* at *5. However, we also noted that the child in question had a difficult time remembering to perform essential daily tasks, including eating and maintaining his personal hygiene. *Id.*

Here, the chancery court found that

Stephanie's condition of mental retardation and epilepsy is in decline. She suffers from seizures, shakes, speech problems, and sleeping problems. She has been dragging her right foot for about a year and her speech has become more slurred during the past year. Her seizures have gotten worse and it takes her longer to recover from each attack. During those seizures, Stephanie is unable to speak or move aside from shaking and making a high pitched noise. She has gained a tremendous amount of weight, and does not notice remnants of food on her face. Her personal hygiene has gotten worse and she has bouts of violent rages, and has been violent with the staff at her group home. The mother does not believe that Stephanie can work as she is prone to violent rages and sleeps more during the day than at night. The testimony of the mother and grandmother was consistent with the

deposition testimony of Stephanie's neurologist . . . who opined that Stephanie is severely disabled.

The testimony in the record reflects that Stephanie is not capable of living independently. Father contends that the chancery court was incorrect to rely on Dr. Maraist's opinion given that he stated that he did not separate "disabled" from "severely disabled." However, it is clear from the record that the chancery court considered all of the applicable testimony and deposition answers provided by Dr. Maraist to come to its conclusion, not just Dr. Maraist's opinion that Stephanie is severely disabled. As noted above, a determination of severe disability rests on no specific definition of the term but rather an "individualized assessment" of the evidence. Having reviewed the record, we cannot say that the evidence preponderates against the chancery court's finding that Stephanie is severely disabled.

Father also argues, with respect to his child support obligation, that Stephanie is not living under the care and supervision of her mother, as required by the statute. We disagree. Father's argument with regard to this issue rests on Mother's testimony that Stephanie stays in a group home four days per week, including staying overnight. However, the record demonstrates that not only does Mother pay for Stephanie to stay in the group home in order to allow her to experience a sense of independence, Mother also visits Stephanie in the group home daily. Additionally, as noted by the chancery court in its order, Stephanie is under a Texas guardianship order entered in 2010 naming Mother Stephanie's guardian. Therefore, we agree with the chancery court's finding that Stephanie is living "under the care and supervision" of her mother as required by the statute. Accordingly, we affirm the trial court's order with respect to continuing Father's child support obligation.

## C. Attorney's Fees

Lastly, Father argues that the trial court erred in awarding Mother partial attorney's fees. In its order, the chancery court provided no explanation for its decision to award Mother partial attorney's fees. An award of attorney's fees is reviewed under an abuse of discretion standard and will be reversed when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes injustice to the complaining party. *Richardson v. Spanos*, 189 S.W.3d 720 (Tenn. Ct. App. 2005)(citing *Perry v. Perry* 114 S.W.3d 465, 467 (Tenn. 2003)).

In Tennessee, a parent to whom custody of a child is awarded may recover from the obligor parent "reasonable attorney fees" incurred in enforcing any decree for child support. Tenn. Code Ann. § 36-5-103(c). Here, Father argues that an award of attorney's

fees are not appropriate in this case because he was entitled to seek termination of child support when Stephanie turned twenty-one absent a finding of severe disability. Further, Father contends that the chancery court was without jurisdiction to order child support past Stephanie's birthday based on the language of § 36-5-101(k) (" . . . the court may continue child support beyond a child's minority for the benefit of a child who is handicapped or disabled . . . until such child reaches twenty-one (21) years of age."). Tenn. Code Ann. § 36-5-101(k)(1).

The apparent confusion in this case over whether there was an existing order requiring Father to pay child support past Stephanie's twenty-first birthday seems to stem from the language used in the previous orders. The chancery court's original order requiring Father to pay child support in this case, the final decree of divorce, found Stephanie to be "severely handicapped" and ordered Father to pay child support for an "indefinite period." Although the court employed the term "handicapped," we infer from the court's use of the modifier "severely" as well as the indefiniteness of the obligation that the court intended to find Stephanie "severely disabled." Unfortunately, in the December 2010 order requiring Father to pay child support until Stephanie turned twenty-two, the court merely used the word "disabled," which, under the statute, would cut off child support at twenty-one. Further complicating the issue, the chancery court's January 2014 order misstated the December 2010 order by claiming that the December 2010 order stated "said child was disabled and child support would continue after eighteen years of age."

Because the January 2014 order merely referenced the December 2010 order with respect to the duration of the child support obligation and did nothing to change the duration, for purposes of determining whether the court erred in awarding Mother partial attorney fees, we look to the December 2010 order. In that order, the court noted that the parties agreed to continue Father's child support obligation until Stephanie turned twenty-two. As Stephanie was not yet twenty-two at the time Father filed his petition to terminate child support, we conclude that at least a portion of Mother's attorney's fees were incurred enforcing a decree for child support. Accordingly, the chancery court did not abuse its discretion in awarding Mother partial attorney's fees.

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the chancery court. Costs of this appeal are taxed to the Appellant, Shannon Gregory, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE